(136 So. 273)

### ROY v. STATE.
3 Div. 693.

Court of Appeals of Alabama.
June 30, 1931.

Rehearing Stricken Aug. 4, 1931.

Douglas Booth, of. Prattville, and Holley, Milner & Holley, of Wetumpka, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

BRICKEN, P. J.

The indictment in this case contained four counts, in each of which this appellant was charged with the offense of murder in the first degree; the specific charge being, she unlawfully and with malice aforethought killed Wesley Roy by shooting him with a gun, etc. The proof disclosed that the deceased named in the indictment was the husband of this appellant, and that they were living together as man and wife at the time he died as a result of a gunshot wound in his breast. The evidence adduced was entirely circumstantial, and counsel for appellant earnestly insist that it was wholly insufficient to support a conviction. The jury returned a verdict of guilty of murder in the second degree and fixed her punishment at imprisonment in the penitentiary for fifteen years.

State witness Dr. R. M. Golson, a practicing physician of 44 years' experience, testified he examined the body of the deceased several hours after his death. He stated: "There was only one wound, a gun shot wound about two inches above the left nipple. The wound was about the size of a 12 bore shot gun and ranged about 30 degrees outward, *and 60 to 65 degrees upward.* The wound would not cause instant death. I would judge it would take about 15 minutes for him to bleed to death," etc.

Sheriff R. H. Weeks testified that he went to the Roy home about two weeks after Roy's death and got two boards out of the floor of the north west room of the house, and took them to Dr. Havens of the health department in Montgomery, and that there were marks or stains on the boards.

One Katherine Mayfield, a witness for the state, testified she was present in the State Laboratory, where she was an assistant, when Sheriff Weeks brought some boards that were to be tested for human blood. That the boards were turned over to Dr. Havens who was in charge. That Dr. Havens took them in his office and examined them later. That she could not swear of her own knowledge that the next time she saw the boards, or saw some boards in Dr. Havens' office that they were the same boards, and in the same condition as they were when Sheriff Weeks handed them over to Dr. Havens. She stated that she was not in constant possession of them from the time they were brought in until the test was made. That Dr. Havens was in possession of them. She said she knew nothing was done to them in the meantime because there was nothing to be done to them until the test was made. She said, "I have Dr. Havens' word for it, and I am sorry he is not here." By defendant's counsel she was asked the following question: "I will ask you if that is what you are basing your statement on, that the boards were in the same condition, upon what Dr. Havens told you and general custom, that is what you are basing your answer on, isn't it?" To which she replied: "Yes sir." Thereupon the defendant moved to exclude the statement of the witness that the boards were in the same condition when the test was made as they were when they were brought in, and the court granted the motion and excluded the statement aforesaid of this witness. But notwithstanding this the court overruled defendant's motion to also exclude the statement of the witness that the test revealed that there was human blood on the boards. To this action of the court defendant duly reserved an exception. This latter ruling was inconsistent to the former ruling in excluding the statement of the witness, which ruling was manifestly correct, her testimony being based clearly upon hearsay, and in order to render her statement to the effect that the test of the boards in question revealed that the stains were made by human blood, the burden was upon the state to show affirmatively that the boards, when the test was made, were in the same condition as when they were taken from the floor in the Roy home and as when delivered to Dr. Havens. Until the state had met the burden, it was incompetent and inadmissible for the witness to testify as to the result of the test thereafter made.

The theory of the state was that deceased was killed in the northwest room of his home from where the boards were taken by the sheriff, and as insisted by appellant the only evidence which could possibly support this theory was that the stains found in the room were made by human blood. It follows that the unauthorized

statements made by witness Mayfield were highly prejudicial and should not have been allowed.

As to the stains on the floor of the northwest room above mentioned, the defendant insisted: First, that the stains in question were not made by human blood at all, but by the blood from a number of hogs that had been butchered and placed in said room by a former tenant, one Hanson, who had lived in this house and had used that particular room for this purpose. And, second, that if the stains in question were in fact caused by human blood, that it could have been caused by the bloody garments of the deceased having been thrown on the floor after his body had been brought from the place where it was found in the woods some quarter of a mile from his home; and that the conclusion to the effect, even if the blood stains were that of a human, would be based upon conjecture and suspicion only that deceased was killed in said room by appellant and not upon evidence as the law requires.

As to the first insistence in this connection the defendant offered as a witness the man Hanson above mentioned, and he testified: "I live up in Lamar County, near Barnesville. In Georgia. I lived in Autauga County up till the first of December, 1928. I lived on Mr. Wes Roy's place at the time I left Alabama. I lived on his place from February until December. The house was built for Mr. Roy's home. Mr. Roy stayed practically at the home of his father-in-law, he and his wife. He was at my house very often. Mr. Roy, another man and I farmed the place. When I moved there that was a new house—hadn't been completed. There were no out buildings. I raised five head of hogs there that year and killed four of them. I killed one about the last of October and the rest in November. That was something like two weeks before I moved. I did not have a smoke house. When I killed the hogs I laid it on the back porch and cut it up and took it into the northwest room and placed it on a scaffold something like three feet from the north window. I suppose a scaffold like that would have squared five feet or upward and the heads and jowls I put on a piece of duck behind the door; the door opened out from the right, inside that room. That door entered into the room from the hall. I cut the meat up on the back porch and toted it in through the hall into that room and spread what I could on the scaffold. I also salted the meat down in that room and at the time I salted the meat down there it got large blood stains behind the door where the head and jowls were and I didn't use any more floor than I could help. I rolled the barrel over it and it staid there until I moved away. The meat was in the barrel at the time I moved it. I haven't been over there since I left there. I

saw Wes Roy there frequently while I lived there. During that time, the year that I lived there Mr. Roy drank quite a bit. He drank practically the entire year. He drank a great deal; practically not able to attend to business during that year, after his operation at the hospital; once I picked him up out of the swamp and took him to my house and put him on the bed and he didn't know how that was for six or eight hours. His brother would drink with him. * * * I killed those hogs 2 weeks before I left. Lester Jackson helped me load the meat when I left. * * * I set the meat behind the door leading into the hall from the northwest room. I brought the meat up the back steps —lifted it up—carried it from the ground right up on the porch and cut it out on the porch. I left some blood scattered about in that room. There were two splotches of blood right inside of the hall door, something about the size of a silver dollar, and as you went into the door in that room there was two more splotches of blood, before I got around behind the door to place the heads down. They were about the same size. That is four spots about the size of a dollar. I remember very distinctly where they were. The spots were about 18 inches or two feet apart in the room. There were two in the hall way. They were about the same distance apart. They were about a step from the double hall doors. The spots in the room were about 3 feet from the door. Those in the hall were something like six or eight feet from those in the room. The smaller spots in the hall was nearest the door. In the room the larger spot was nearest the door. I couldn't tell how much blood was left out on the porch."

The undisputed evidence tended to show that the deceased, his wife (this defendant), and a hired man by the name of George Watts, went together to Prattville on the day in question in a car and returned home about 3 o'clock in the afternoon, and his wife (defendant) testified: "I am the wife of Wesley Roy. On the day he was found dead we had been here to Prattville that morning. When we left here we went to Papa's to see how he was. He was in bed sick. We stayed there about an hour and then went on home. It was three o'clock when we got there. Russell Tatum stopped there about that time. We had just driven into the garage. It was raining. I did not come out of the garage before my husband and I went to the house. He went out to where Mr. Tatum was and I stayed in the garage. Mr. Tatum didn't stay there very long. After he left we got our bundles and went on in the house. My husband was drinking that day. No one was with us when we went in the house. George Watts came down to Prattville with us and went back with us. When he got out of the car he went around the house to get the bucket and go get water. We lived on the left hand

side as you go in. There are three rooms on the south side of the house and two on the north side of the house. When my husband and I got into the house we went into the living room on the left hand side where my husband and I stayed. We were there together a pretty good while. He changed his clothes and got his gun and said he was going hunting—that he would be back after while. That was between three thirty and four o'clock. I did not see Mr. Russell Tatum any more. When he left my husband asked George Watts to stay there and do the night work for him. He had four head of stock. He was sitting there churning and I was in the dining room cooking when we heard the gun and I said 'I guess he has got him, a squirrel' and the boy said yes, I guess so. After he got through churning we went out and done up the night work. Then he came in the house and asked me if there was anything else I needed him to do and when I told him no, he said he was going over to bis mother's. He left the house then. I don't know just how long he was gone. Troy Roy and a negro came to my house before sundown. They stayed there about a half an hour. I don't know exactly. While they were there George Watts came back. He asked me if Wesley Roy had come back to the house and I told him that I hadn't seen him. When he came up Troy Roy asked me where Wesley was and I told him he had got the gun and said he was going hunting and then he said 'Well did he leave mad'? and I said 'No he didn't' and he said 'Well, was he drinking?' and I said he was and he asked me if he carried any whiskey with him and I told him he did. That was practically all the conversation I had with him at that time. When George Watts came Mr. Troy Roy didn't say anything to him in my hearing. I told Watts to go on through the way Wes generally went hunting and see if he could find him down there. He was gone ten or fifteen minutes when he came back he said that he was dead—that he had found him in the woods. Me and Troy and the negro and Watts went back down there where he was. We found my husband where he was lying there. From there I went up to Mrs. Wright's. There was not any trouble between me and my husband at all that afternoon. I did not see anyone else in my presence or hearing shoot my husband. I did not see my husband at any time after he left the house until I saw him there on the ditch. There had been no trouble between me and my husband. We had separated twice on account of his drinking. We had not had trouble except from his drinking. We were separated at one time for less than a week and the other time for longer than a week. I am twenty eight years old. My health has been bad. I have a goiter. At that time and since that time I have been unable to make any strenuous exertion or do anything that exerts me severely. I have been suffering real bad from this goiter for three years. I have other ailments and have been under the treatment of a physician almost continuously for the past three years. On the day that my husband was found dead there had not been any cross words or ill feeling between my husband and me. It had been close on to a year before that time since we had had any trouble because of this drinking. * * *. There were some discolorations or stains on the floor of the house at the time I moved into it. There were no other stains there at any time in that house that I know of other than the stains that were on the floor at the time I moved into it after Mr. Hanson moved away. I was not in the room there where my husband was that night after he was brought home. I wasn't able to go in there."

Troy Roy, brother of the deceased man, testified, among other things: "I saw Mrs. Roy at her home a little before night. That was before the body was found. I don't know how long before dark it was. It was a cloudy evening. It looked like about an hour by sun. Wesley's wife was there when I got there. I asked for my brother. Witness was then asked the following question: 'What did she tell you?' Defendant objected to the question and the court overruled the objection, to which ruling of the court, defendant, duly and legally excepted. Witness answered: 'She said he had gone off with a gun. * * * I was there when George Watts reported finding the body. * * * When he came back he said he found him down in the bottom, dead. I went down there with Azla, and George, and a negro boy. We went straight to him. He was lying flat on his back, both arms sorter back in this direction. He was kinder on the edge of a ditch like, with one leg sorter in the ditch the least bit. That was before dark. There was a gun under him. * * * I looked at the body when I first got down there. I examined him to see if he was dead and he was dead but not still. I put my hands on his face and moved his arms. * * * I could see where he was wounded. I did not make an examination of him to see how badly he was wounded. I felt of his pulse, but didn't examine his wound. * * * I didn't observe anything lying around the body. A gun was lying under him—cigarette book or some cigarette papers and a penny box of matches were lying on his breast. I didn't see anything else. His wife put her hands on him. * * * Mrs. Roy went to Mrs. Wright's home. I told her to go down there."

■ During the argument for the state, the state's counsel stated to the jury: "This is another Ruth Snyder and Jud Gray case. You gentlemen know that in that case in the great State of New York, these people brutally murdered Ruth Snyder's husband, and the jury said they should both die. This wo-

man here deserves the same fate that Ruth got—the electric chair. Thereupon the defendant objected to this argument and moved to exclude it, and asked the court to instruct the jury not to consider it. The court overruled the motion of defendant, and defendant duly and legally excepted."

We are of the opinion that the court should have sustained the objection interposed to this statement; in overruling the timely objection of defendant the court erred to a reversal. We pretermit the question as to the right of the state's counsel to make mention in argument of the Ruth Snyder and Jud Gray Case, because of its notoriety; but to argue as a fact that this case is on all fours with the Snyder and Gray Case, with all its attendant sordid, repulsive, and horrible details, in the absence of any evidence showing or even tending to show any improper relations between this appellant and the hired hand Watts, transcends all bounds of legitimate argument, was ill advised and improper, and it is insisted that the statement was predicated only upon the fanciful and unfounded suspicions in the mind of the speaker —the state's counsel—that it was grievously injurious to the accused cannot be questioned. In Cross v. State, 68 Ala. 476, the court said: "In his closing argument, the prosecuting attorney was allowed to state, as facts, what he alleged had occurred in the perpetration of another homicide-having some alleged features analogous to those developed on this trial. Now, there was not only no evidence before the jury of that other homicide, or its details, but such evidence, if offered, would have been illegal and irrelevant. This was not argument, and could furnish no safe or permissible aid to the jury in considering and weighing the testimony before them."

We need consider no other questions presented, except to say the trial court in our opinion should have granted defendant's motion for a new trial. Several of the grounds thereof appear to have been well taken.

Reversed and remanded.