159 So. 275

**HAND v. STATE.**

**4 Div. 74.**

Court of Appeals of Alabama.

Feb. 5, 1935.

318

Frank M. deGraffenried, of Seale, and Roy L. Smith, of Phenix City, for appellant.

A. A. Carmichael, Atty. Gen., for the State.

BRICKEN, Presiding Judge.

From a judgment of conviction of murder in the second degree and a sentence to imprisonment in the penitentiary for twelve years, this appeal was taken.

Upon the submission of this cause, counsel for appellant made an elaborate argument in behalf of appellant, from which, as well as from a careful and attentive reading of the entire record, and briefs of counsel, this court has a clear mental impression of all the facts and circumstances involved in the unfortunate and mysterious death of the deceased.

It appears from the record that the facts of this case as disclosed on the trial in the court below are substantially as follows: On Saturday, the 9th day of June, 1933, Perry Bullard (deceased), Danville Tharpe, Tom Dingler, and the defendant, Eley Hand, associated themselves together and composed a fishing party, which party left Phenix City, and went out to Uchee creek, which lies west of Phenix City, and is reached by the Montgomery-Columbus public highway, which crosses this stream, and it was by this highway that this fishing party reached the fishing waters.

It was testified to by Eley Hand, and this testimony seems to have been admitted, that on the Saturday afternoon in question, he (Eley Hand) was indisposed, and that he was originally not one of the party to the fishing trip. Eley Hand, however, owned an old model T Ford coupé, and this two-passenger automobile was the conveyance that these four young men used in going from Phenix City to the Uchee creek.

When the fishing party reached the home of a Mr. Allison, who resided on the highway and near the fishing ground, they stopped to secure permission from him to fish, and also to get some drinking water. Among other things, Mr. Allison testified: "Those men did not appear to be drinking at that time, they were all just a friendly, sociable bunch; they said they wanted to go fishing and I told them to go ahead. The creek ran through my pasture, when they left my house they drove a short distance West down the Columbus-Tuskegee Highway and then turned to the right and drove until they came to the wire fence which made the West side of my pasture, and where the road was intersected by the wire fence there was a gap which was closed by strands of wire that made the fence being cut loose from the fence and nailed to another gate which was fastened at the bottom and top; that's the way they went to the creek; the plantation road from the Highway to the Creek was in such condition as that it could be traveled by an automobile. After they had disappeared from my sight I didn't go down to the Creek and I didn't hear anything more of those men during that afternoon and night. I didn't hear them on the Creek; I didn't hear them talking or crying or making any noise at all."

The fishing party reached Mr. Allison's home around 2 o'clock on Saturday afternoon. When they left his home, this was the last seen of any member of that party until aft-

er daylight the following Sunday morning, when Eley Hand was seen walking westward along the Montgomery-Columbus highway by a Mr. Dudley, who was in his front yard, situated just immediately north of this highway and at a distance of some 10 or 12 miles west of Mr. Allison's home and the Uchee creek.

Mr. Dudley testified: "I saw Eley Hand walking down that Highway going West towards Tuskegee and he had the appearance of a man who had been drinking, meaning that his face was red; I have had experience with that kind of thing and the impression created upon me was that he had been drinking the night before." Eley Hand was next seen by a negro, Booker T. Nickerson, in the same highway, and about a half mile west of where he was seen by Mr. Dudley. A conversation took place between Eley Hand and this negro, and Eley Hand then turned around and retraced his steps, and, when last seen by Mr. Dudley and Booker T. Nickerson, Mr. Hand was traveling in the highway, afoot, going east.

About midnight Saturday night, or 1 o'clock Sunday morning, the witness Johnny Jones saw a model T Ford coupé about 40 or 50 yards from the house of Mr. H. L. James, and at that time this car was parked in the edge of the highway headed towards Tuskegee. Mr. Jones testified: "I just drove on around it and didn't notice anybody in it; the lights were not on and I didn't see anybody around it." On cross-examination Mr. Jones testified with reference to the car: "I saw that car stopped or parked in the road, not in the middle of the road but in the edge, kind of; I didn't pay much attention to it; I had to drive around it; I didn't see anybody in it, and I drove the car I was in on into Mr. James' yard and called Mr. James to let him know I had returned. It was then about half past twelve or one o'clock and I came back to the road and went on home about a quarter from there."

The Ford coupé in front of Mr. James' house was next seen by a little boy, De Witt James, who testified: "I remember the morning I saw an automobile out there in the middle of the road near our house; I got up and went to feed the mule and as I was going to the barn I saw it just below the house, right in the middle of the road, it looked like they had just got out of the car and left it there. I couldn't see anything but just the head and shoulder of a person in the car; it looked like they had on a black hat." De Witt James told his father,

H. L. James, about seeing the automobile out in the road, and Mr. H. L. James testified: "I live out on the Montgomery-Columbus Highway, I remember the 10th day of last June; I saw an automobile out there around my house that morning, it was pretty early in the morning, I just had got up, possibly six or maybe not six o'clock; when I saw it the automobile was right down below my house sort of back towards Columbus; it was a Ford Coupe, headed toward Tuskegee and Montgomery; parked almost in the middle of the road; it looked like a man was laying over on the right side, you could see one shoulder and his head, I taken it to be a man." On cross-examination Mr. James testified that within five or ten minutes after he first saw the car he saw a man in this highway about 200 yards away going up a hill toward Columbus.

It would appear, therefore, according to the testimony, very early Sunday morning Eley Hand was walking in the Montgomery-Columbus highway traveling west and about 10 or 12 miles west of Mr. Allison's pasture and the fishing grounds where he had been the night before. At this same time Eley Hand's Ford coupé was parked in the highway in front of Mr. James' house headed toward Tuskegee and Montgomery, and about 5 or 6 miles west of Mr. Allison's home and the fishing grounds. Saturday night when Johnny Jones saw this car then parked in the edge of this highway he saw no one in the car or around it. Very early Sunday morning, when De Witt James and his father saw the automobile parked in the middle of the road, some one was in that car, and Eley Hand was then 5 or 6 miles down the road west of the car.

According to the testimony of Eley Hand, and it is the only testimony that relates to this question, when he and Perry Bullard, Tom Dingler, and Danville Tharpe left the home of Mr. Allison and drove down to the creek, they had some home-brew and whisky. They carried these intoxicants with them on this fishing trip. The party was a congenial one, and everybody was friendly and in good humor. When they reached the creek and stopped the car, "Mr. Bullard and Tom and Danville took the seine and went over there somewhere to go get some bait, and they brought some back and I went to putting some lines on the poles and when they brought some bait back I went to cutting them up and started to setting out some hooks, and they went back after some more bait, and they couldn't find very many, they said; they got some crawfish and two or three little fish,

and I think that's all, and we cut them up and baited with them. At that time and on that occasion I had that knife or one like it. (Indicating the knife introduced in evidence), we all used it, cutting up and baiting the hooks. I would cut up some and they would cut up some, fish and crawfish too; that was in the evening before the shadows of night had fallen. While those others were away getting the bait I was putting some lines on poles and drinking most of the time, that whisky and home-brew; they would go after the bait and it was hard to get, and they'd bring back when they would get some, and they went back after some more once or twice, I don't know just how many times; I didn't go with them after bait; I put out some hooks, I don't recollect whether I took them up or not. After we ate supper I had done got drunk and I don't remember anything else from then on. The last thing I remember that occurred that night was us eating supper; I had no fuss, difficulty or quarrel with Mr. Bullard, Tharpe or Dingler; I had never had a bit of trouble with Mr. Bullard of any kind, I had never had any hard feelings towards him. The next thing I remember that happened, while I was away from home is waking up in that pine orchard, something near daylight; I don't know how I got there; when I waked up I went on, trying to find the way home; I went and got in the road and thought I was going the right way and I went on until I met this negro; there were lots of houses on that road I traveled; but I don't know who lives in them; I had never traveled that road before; there were store houses along the road; I don't remember how many I passed; I stopped at one coming back but I don't know the name of it, it was a store with just a square building with a porch to it, at the front on which was something to sit on; I sat down there a while and then got up and went on, going the other way, continuing to travel in the same direction I had been traveling until I met a negro and I turned around and came back after I had said something to him. I saw Mr. Austin Dudley on the stand and heard him testify; I didn't know him but recall passing somebody in an automobile that morning; when I met the negro and turned back I stayed in the same road; Mr. Dudley went by me and then came back and passed me again; the negro came back up the road, he was coming this way and I came on back until we got to the store, and he stopped at a little store where Mr. Dudley was and I continued to walk on back up the road from the direction I had come. I didn't get a ride up that road anywhere or see anything that I knew and recognized until I found that old Ford of mine; I did find it in that road, headed yonder-way, towards Tuskegee; I went up to the car and Perry Bullard was in it laying over there on the door; I tried to wake him up and couldn't wake him up and I went around the car and looked over in there and saw then that he was dead; there was some broken bottle right in the foot of the car at that time, and I throwed out some of it, most of it, down on the ground right where the car was parked; the first thing I thought of was to bring him home and I got in the car and brought him on home; I cranked up the car, started it myself, and drove it back; I did not kill Perry Bullard, I don't know who did."

Eley Hand, Tom Dingler, and Danville Tharpe were arrested upon a warrant charging them with the homicide of Perry Bullard, and they were subsequently indicted by a grand jury of Russell county, and the indictment charged that Eley Hand, Tom Dingler, and Danville Tharpe unlawfully and with malice aforethought killed Perry W. Bullard by cutting him with a knife.

The testimony of Dr. Ashby Floyd shows that he examined the dead body of Mr. Perry W. Bullard the Sunday morning when he was brought into Phenix City, after his death. He testified: "I examined his body and found that he had an abrasion on the front of his head. (The witness indicated where he found the abrasion). It looked like he had been hit with a bottle or some hard substance, the skin wasn't broken but you could see where it was bruised; I don't think that wound produced his death. Then I found a wound right behind his left ear. (The witness indicated on the Solicitor the location of the wound). I probed that wound with a flat probe about two and a half inches deep, and about three quarters of an inch wide; in my judgment that wound was made with a knife; and in my judgment it produced his death."

When Eley Hand was arrested, one of the police officers who arrested him took from his person a pocketknife. This pocketknife was introduced in evidence, and as to it the doctor testified: "I didn't see that knife at the house that day, I saw it the day they had it at the undertakers establishment when they had a coroner's inquest. I made the probe on Sunday morning, and the day they had the inquest I took that knife and put it on the wound, not down in it but just across it, and the blade was just exactly the width of the cut and the depth of the wound was ap-

proximately the length of that blade; it was two and a half inches by rule deep and that blade is about that long, and I state that the depth and the width of the wound corresponded to the depth and width of that knife."

The doctor further testified, with reference to the knife, on redirect examination: "There was something on it that looked a little red; I couldn't say that it was blood, I don't know whether it was rust or blood, I did the best I could to see what it was but I couldn't tell."

The doctor further testified on his direct examination that on Monday morning, the day the coroner's inquest was held, the dead body of the deceased was at the undertaker's lying on a table, and that he, "saw Eley Hand when he walked in, I think the Sheriff or a Deputy was with him; he seemed to be sober; I didn't see him on Sunday; when he saw the corpse he seemed terrible startled and nervous; I couldn't help but notice the expression on his face, it was horrible; I didn't notice anything else unusual about his condition; all I heard him say was, 'I just don't believe I done it.'"

On cross-examination the doctor testified with reference to the wound back of the left ear of the deceased as follows: "Then I found a wound back of his left ear apparently about a half an inch wide and about two and a half inches deep; any sharp instrument with a knife like blade that was about a half inch wide and two and a half inches long would have made that wound; I don't attempt to tell the jury that that knife (the one exhibited to him), made that wound, and I don't attempt to tell the jury that any of the stains on that knife blade are blood stains nor would I attempt to say that if they are blood stains they are human blood stains."

The doctor further testified on recross-examination that it was possible to take the knife blade and if there are stains on it to place it in the hands of a microscopist or chemist and tell whether or not the stains are blood stains; he could first say whether or not it was blood; and, if he said it was blood, he could then tell whether or not it was human blood.

The doctor further testified on cross-examination that Eley Hand had been accused of the homicide of the deceased, and that the doctor had been informed that Eley Hand was very much under the influence of liquor when he brought the dead body of the deceased home, and that it was his experience as a medical man that men, following drunkenness, are in a nervous condition, and that the dead body of a man lying stiff and cold in death in a mortuary is a subject calculated to arouse the horror of a man accused of his murder.

At the conclusion of the introduction of testimony by the state in presenting its case in chief, the defendant moved the court that he be discharged from further prosecution for want of sufficient evidence to justify his conviction. The motion was overruled, and an exception was duly reserved.

The defendant requested the following charges in writing: "(1) The court charges the jury that if they believe the evidence in this case beyond a reasonable doubt, then the jury cannot convict the defendant Eley Hand."

"(4) The court charges you, gentlemen of the jury, that circumstantial evidence justifies a conviction only when it is inconsistent with any reasonable theory of innocence, and you should be so convinced by it that each would be willing to act on the decision in the matter of the highest concern to themselves." The court refused the foregoing charges and defendant excepted.

It is not denied that Perry Bullard (deceased named in the indictment) was killed and that his death was produced by the wound in his head, back of the left ear. It was and is strenuously denied that Eley Hand, the defendant, killed him, or participated in any manner in his death.

█ It is conceded that the corpus delicti may be proven by circumstantial evidence. The corpus delicti in this case to be proven was that this appellant struck the fatal blow which produced the death of deceased, or that he aided or abetted therein.

█ Mere presence of the defendant, without giving aid or encouragement at, or before, the commission of the homicide, without prior conspiracy, does not constitute aiding and abetting.

█ Where a killing occurs in the course of a joint assault, or fray, in the absence of a common design, it must be shown that the accused struck the fatal blow, or aided and abetted therein. Turner v. State, 97 Ala. 57, 12 So. 54.

The record in this case does not contain the testimony of any witness who testified that the appellant killed the deceased, or caused him to be killed. The state attempted to prove that the defendant killed the deceased, or aided or abetted therein, by circumstantial evidence; that is to say, it at-

tempted to prove a body of facts, of so conclusive a character, as to warrant the reasonable belief, beyond a reasonable doubt, and to that degree of certainty on which reasonable and discreet men are accustomed to act in relation to their most important affairs, that the defendant either killed the deceased himself or that he aided and abetted therein.

■ This court, in the case of Tatum v. State, 20 Ala. App. 24, 100 So. 569, in an opinion by Samford, J., has clearly, concisely, and conclusively drawn the distinction between direct and circumstantial evidence, and that case clearly holds that the probative force of the facts and circumstances proved must be so conclusive in character as to exclude every other reasonable hypothesis or theory, but that of the guilt of the defendant.

■■ So far as we have been able to ascertain from a careful and attentive study and consideration of all the evidence adduced upon the trial of this case, there is nothing to show, or tending to show, that this appellant struck the fatal blow, or that he aided or abetted in the slaying of the deceased. He testifies positively that he did not do so, and the evidence is wholly without dispute to the effect that he and the deceased were on the best of terms and friendly, and no attempt was made to show any motive upon his part to commit the offense charged against him in this case. The facts, as the evidence shows, that the defendant was in possession of a weapon with which the death wound could have been inflicted, and that he was the person who brought the dead body of deceased home to deceased's father, might have been calculated to create a suspicion that he may have been connected with the commission of the homicide. But, as has often been stated, a conviction for crime may not be rested upon suspicion, surmise, or conjecture, and certainly there is force in the insistence of able counsel for appellant to the effect the very facts upon which such suspicion was or may have been rested are wholly refuted by the action of the accused (1) in retaining the knife in question in his possession; and (2) in his open action in returning the body of deceased to his father, as hereinabove stated.

■ The material and controlling question in a case of this character is not that the accused might be guilty, for the burden of proof here, as in all criminal cases, rests upon the state to prove his guilt, by the evidence, beyond all reasonable doubt and to a moral certainty. The all important question therefore is, has the state met the full burden of proof resting upon it in this case? We are not prepared to so hold.

■ The admission of the testimony of Dr. Floyd as to the knife in question and the spots thereon, whether blood or rust (in his language), was of doubtful propriety. There are well-established rules governing and controlling testimony of this character, and the state was under the duty of showing that proper steps had been taken to render this testimony admissible. There was no effort on the part of the state to comply with these rules. And it appears affirmatively that this witness and others were permitted to testify, without predicate of any sort, as to their opinion about the knife and the spots thereon, all of whom were manifestly not qualified so to do. No chemical test was sought from the state chemist or other legal authority; in the absence of which testimony of this character is inadmissible and should not be allowed. That this testimony, though illegal, incompetent, and admissible, was highly prejudicial to the substantial rights of the accused, cannot be questioned. Roy v. State, 24 Ala. App. 419, 136 So. 273; Roy v. State, 25 Ala. App. 510, 149 So. 713. In connection with the foregoing, the following is shown by the record: The knife in question was in the possession of the state's representatives from the day it was delivered to them by the defendant and until it was introduced in evidence. The chief of police of Phenix City, upon his examination as a witness, was asked: "Chief, did you make any effort to have that knife examined by a chemist?" He replied: "Mr. Waddell, (County Solicitor) and I talked about it, and Mr. Bullard (father of deceased) and I, but we never did send it off."

It is conceded by authors of medical jurisprudence that testimony relating to blood stains, when based upon the color of the stains, is unreliable because it has been abundantly proved that color alone is often fallacious. Chemistry and microscope will determine the presence of a blood stain, if it in fact exists, with unfailing accuracy. It was not only within the province and power of the state, but also its duty, to have secured this testimony. Failing so to do rendered the testimony in this connection incompetent, and inadmissible as above stated.

■ Charges 1 and 4, requested by the defendant, in writing, should have been given

by the trial court. The refusal of the trial court to give said charges is error, for which this case must be reversed. Cannon v. State, 17 Ala. App. 82, 81 So. 860; Tatum v. State, 20 Ala. App. 24, 100 So. 569; James v. State, 22 Ala. App. 183, 113 So. 648.

The state, during the progress of the trial, introduced testimony relating to an investigation of the fishing site where the defendants in the indictment and the deceased parked their automobile. Among other things, it was testified: "We found evidences that something had been dragged over the ground from near where that fire was back towards the car, but after we got up to the hard surface there was no evidence of the dragging."

It is evident that the inference sought to be drawn from this testimony was that the described trail, or track, was made by the dragging of the dead body of the deceased to the automobile. In rebuttal of this testimony, and of the inferences to be drawn therefrom, the defendant proved, by Mr. E. A. Kimbrough, a deputy sheriff of Russell county (and now the sheriff of said county), who was present at the time the investigation was made pertaining to the above-mentioned trail, or track, and he testified, among other things, as follows: "I saw evidence of something having been dragged on the ground from the vicinity of that fire spot; I did not form any opinion as to what made or caused that dragged way, because that was too hard. I know what kind of a trail a croker sack, crawfish or minnow seine, will make when dragged over the ground in a place like that place was, depending upon the weight you have in the sack. I am familiar with the kind of trail a crawfish or minnow seine, made out of guano sacks, with sticks on either end, would have made down there."

The witness was then asked this question: "Q. Well, if they had a sack and it was wet and dragged it along the ground there, say whether or not, in your opinion, it would have made the kind of trail you saw? Answer: Yes, sir."

The state objected to the above question and moved to exclude the answer thereto, which objection and motion the court sustained, and to such ruling and action of the court the defendant duly reserved an exception.

In a prosecution for a homicide, all of the surrounding facts and circumstances being admissible, evidence as to the nature of tracks, drags, etc., about the place where the crime is alleged to have been committed, is also admissible.

The evidence for the state being competent, as descriptive of the scene, its markings and surroundings, it is evident that the testimony of Mr. Kimbrough, explanatory of any track, drag, measurement, or other matter pertaining to the scene and its surroundings, and explanatory thereof, was also competent and relevant. The exclusion of this evidence by the trial court was highly prejudicial to the defendant, and was also error sufficient to cause a reversal of this case. Keith v. State, 15 Ala. App. 129, 72 So. 602; Russell v. State, 17 Ala. App. 436, 87 So. 221.

It appears from the record in this cause that the theory of the state in this prosecution was that Tom Dingler and Danville Tharpe, each of whom married a sister of the defendant, together with the defendant, Eley Hand, conspired together and plotted the death of Mr. Bullard, the deceased. As a part of that conspiracy, the insistence was that Mr. Bullard was lured and enticed into a fishing expedition by them, and that, when they got the deceased out on the Uchee creek, they ganged together and killed him. The indictment charges the three of them with the homicide. In rebuttal of any evidence that tended to connect and combine these three men in a conspiracy to kill the deceased, the defendant, Eley Hand, offered to prove by a witness, Charlie Byrd, the facts and circumstances under which Eley Hand, the defendant, consented to join the fishing party. The defendant proved by this witness that it was at the solicitation of the deceased himself that Eley Hand, the defendant, consented to go along with them. The court sustained the state's objection to this testimony, and the defendant excepted.

The principle is well established in this state that, if two or more persons combine together to do an unlawful act, and in furtherance of this common design, all of the confederates being present, at or near the scene of the unlawful act, and one of them gets into a difficulty with their common adversary, and one of them kills him, all are guilty. A conspiracy is frequently established by inferences drawn from what the conspirators do and say, both before and after the unlawful act. It is manifest, therefore, that, in rebuttal of any inference to be drawn from any of the testimony, or from the testimony itself, showing the presence of Tom Dingler, Danville Tharpe, and Eley Hand with the deceased on this fishing party, that Eley Hand was so present at the solicitation and

upon the request of the deceased himself, was important evidence relevant to the issues involved and to which the defendant was entitled. The trial court committed error, prejudicial to the defendant, in excluding the testimony of the witness Charlie Byrd.

Appellant's counsel urges this court, in the event a reversal of the judgment of conviction is here ordered, to provide for and fix the bail of the defendant pending further proceedings in this case. Under the statute there is no necessity for an order of this character at our hands. Section 3246 of the Code 1923, makes ample provision in this connection. That section provides: "When the judgment of conviction is reversed and the cause remanded, such undertaking [bail bond] binds the defendant to appear from term to term until discharged by law and answer the charge, as in bail before conviction," etc.

As a result of said statute, the proper authorities having custody of defendant will, as a result of the reversal of the judgment of conviction in this case, promptly release him on the same bond executed by him for his appearance at the trial of this case in the lower court.

For the reasons hereinabove given, the judgment of conviction from which this appeal was taken is reversed, and the cause remanded.

Reversed and remanded.