251 So.2d 240

### Louise VANDER WIELEN
v.
### STATE.
### I Div. 58.

Court of Criminal Appeals of Alabama.
April 6, 1971.

Rehearing Denied May 4, 1971.

C. Wayne Loudermilch and Charles R. Butler, Jr., Mobile, for appellant.

**110**

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

Louise Vander Wielen appeals from a conviction for murder in the second degree for the killing of her husband Charles Vander Wielen.

Appellant was jointly indicted with her son, Tommy Davidson, but a severance was granted and appellant was tried separately.

The facts are substantially as follows:

On the morning of May 21, 1968, the body of Charles Vander Wielen was found in the front seat of his automobile which had run off Interstate Highway 10 in Baldwin County Alabama. Death had resulted from a massive hemorrhage to the brain caused by a blow inflicted by a blunt instrument.

The appellant and her son, Tommy Davidson, were arrested by Mobile County Sheriff's deputies on May 28, 1968. They were interrogated and appellant gave a written statement describing the killing of Charles Vander Wielen by Tommy Davidson, allegedly in defense of himself and appellant. On approximately May 30, 1968, a search of appellant's residence was conducted, which produced evidence which, together with appellant's written statement, was introduced in evidence by the state.

The appellant testified that immediately prior to Tommy Davidson's striking Mr. Vander Wielen with a baseball bat the deceased had placed a gun to her head and stated he would give her one minute to say what she had to say. When Tommy struck the first blow she fled from the house. She offered character witnesses in her behalf and evidence of prior threats on her life by deceased.

■ Defense counsel excepted to this portion of the court's oral charge:

"As to this doctrine of retreat. If the wife, Louise Vander Wielen, was in her own home she did not have to retreat in order to qualify as to retreat under the doctrine of self defense. However, if the assault was committed by Tommy Davidson who was at the most a guest in the home he would be required to retreat before self defense could be asserted unless he was acting in defense of his mother because she would not be required to retreat and therefore he could act without her retreat in order to qualify under the doctrine of self defense. If the assault was upon him directly and not upon the mother then he be required to retreat."

Counsel insists in brief that since Tommy Davidson was a guest in his mother's house he was under no duty to retreat.

In Thomas v. State, 13 Ala.App. 50, 69 So. 315, the court said:

"If the defendant was a guest of the owner or occupants of the house, there by pre-arrangement with them on their invitation, while in the house in that ca-

pacity the law armed him with the right to defend himself *against an unlawful assault from outsiders,* he being free from fault, and to employ all necessary force to protect his own life or his person from grievous harm. For this purpose and under these circumstances, he was armed with the same rights of self-defense as if he had been the owner of the house, *as to all persons except its lawful occupants;* in other words, to that extent this house was his castle for the purpose of defense, and if without his fault he was assaulted there *by an intruder,* the law imposed on him no duty to retreat therefrom, but he had the right to stand his ground and defend himself even to the taking of the life of his assailant." (emphasis supplied.) See also Valentine v. State, 19 Ala.App. 510, 98 So. 483; Simmons v. State, 22 Ala.App. 126, 113 So. 466.

Tommy Davidson was married and living in his own home. He came unannounced to his mother's house to borrow her automobile: But even if he could be said to be a guest under *Thomas,* supra, he had no right to stand his ground as against the lawful occupant of the house. We find no error in the court's charge.

Requested Charges 31 and 35 were properly refused. They ignored Tommy Davidson's duty to retreat and were otherwise faulty.

■ Appellant contends the affidavit for a search warrant of her house at 4083 Alice Drive, Theodore, Alabama, is wholly inadequate and that it was error to introduce evidence seized as a result of said search.

The appellant testified in support of her motion to suppress that while she had paid the rent and was entitled to occupy the house at the time of the search, all her clothing and furniture had been removed from the house and that at the time of the search she was living in Florida. This evidence was sufficient to warrant the trial court's finding that the house had been abandoned by the appellant and to justify the conclusion that appellant lacks standing to challenge the legality of the search. Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559. Nor can it be held, as urged by appellant, that a finding of abandonment is foreclosed until the paid rent period has expired. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668. Feguer v. United States, 302 F.2d 214 (8th Cir. 1962).

■ Defendant's witness Colin Douglas Willis was asked if he knew deceased's reputation for carrying a pistol. The witness answered, "Yes, sir; I heard he carried a pistol." The state objected and moved to exclude the answer. The court sustained the objection and granted the motion to exclude the answer.

■ A defendant who admits the killing but claims to have acted in self defense, is entitled to show that deceased was in the habit of carrying a pistol or other deadly weapon. Of course, the evidence must also show that defendant had knowledge of the habit of deceased in carrying weapons. Clinkscale v. State, 37 Ala.App. 593, 73 So. 2d 244, and cases there cited. As was said in Sims v. State, 139 Ala. 74, 36 So. 138, the "cases do not go to the extent of supporting the contention that a witness other than defendant knew this fact when such fact is not traced to defendant's knowledge."

But even defendant's knowledge of deceased's habit of carrying weapons would not have been pertinent here. She denied the killing and testified Tommy Davidson struck the fatal blows.

■ Appellant moved to suppress her written confession on the ground that it was involuntary. A voir dire hearing was conducted outside the presence of the jury. A proper predicate was laid as to threats, inducements, etc. Taylor Wilkins, Sheriff of Baldwin County testified that before she made the confessory statement he advised the defendant of her constitutional rights and read to her a statement of her rights to have an attorney present, after which she

signed a "Waiver of Rights." The warning read to defendant and the waiver, State's Exhibit 30, reads:

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can and will be used against you in Court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

## WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises, threats or inducements have been made to me and no pressure or coercion of any kind has been used against me.

SIGNED /s/ Louise Vander Wielen"

Defendant's written statement reads in pertinent part as follows:

"Q. On the night of May 20, 1968, which was a Monday night, did anyone visit you and your husband at your home?

"A. No one but my son Tommy.

"Q. Do you recall about what time it was that Tommy came to your house?

"A. To the best of my knowledge it would be 9:00 or 10:00 P.M.

"Q. Was Tommy's visit to your house a pleasant one?

"A. No. My husband and I were having an argument.

"Q. Did Tommy's arrival at your house seem to agravate things?

"A. No sir, not as I know of because I was scared to death.

"Q. Why were you so afraid?

\* \* \* \* \* \*

"A. Because he had done got on me, slapped me around and said he was going to kill me.

"Q. Was Tommy there when these threats were made to you?

"A. Yes sir.

"Q. Did anything happen between Mr. Vander Wielen and your son Tommy?

"A. Tommy tried to talk to my husband and calm him down but I don't recall everything that was said. I remember him saying that he didn't want to break up a marriage.

"Q. After Tommy talked with your husband did anything else occur?

"A. The best I remember my husband got madder and madder and told him he would do to me what he wanted to and it wasn't anybody's business.

Tommy said didn't he know there was a law against it and he said damn the law.

"Q. What, if anything, occurred at this point?

"A. My husband had a gun in his hand and threatened to kill Tommy and me.

"Q. What happened after this?

"A. I heard a lick and the next thing I saw was my husband falling in the area of the kitchen and I don't know how many times Tommy hit him.

"Q. After Mr. Vander Wielen fell to the floor, what happened then?

"A.  I cleaned the floor up and Tommy put my husband in the trunk of my automobile after we put a quilt in the trunk to put him on.

"Q.  What happened after Mr. Vander Wielen was put in the trunk of your car.

"A.  We finished cleaning the blood in the kitchen and then we locked the house.

"Q.  Did you put anything other than Mr. Vander Wielen's body in the trunk of the car?

*   *   *   *   *   *

"A.  Tommy put some clothing in my husband's Ford.

"Q.  Did your husband have a dog?

"A.  Yes sir.

"Q.  What did you and Tommy do with the dog?

"A.  The dog was in the car with Tommy.

"Q.  Do you recall about what time it was when you and Tommy left your house on Alice Drive?

"A.  I don't remember.

"Q.  When you left what car were you driving?

"A.  I was driving mine, the Tempest.

"Q.  The Tempest is the one that had Mr. Vander Wielen in the trunk is that correct?

"A.  Yes sir.

"Q.  What was Tommy driving?

"A.  Mr. Vander Wielen's car.

"Q.  When you left your residence what car was ahead of the other?

"A.  Tommy was leading me.

"Q.  What route did he take Mrs. Vander Wielen?

"A.  We went around by the post office in Theodore and came out in Theodore beside a building and turned right out on 90 toward Mobile.

"Q.  How far did you drive U.S. 90 East toward Mobile?

"A.  I believe we turned off on the Interstate going North and we went through I believe Prichard I don't know exactly where and went around the tunnel.

"Q.  You did drive across the bay did you not?

"A.  Yes.

"Q.  Did you make any stops after you got across the bay?

"A.  Yes sir.  We made a stop on a dirt road in the woods.

*   *   *   *   *   *

"Q.  What, if anything, occurred when you made this stop?

"A.  Tommy took my husband from the trunk of my car and put him in the seat in the Ford.

"Q.  What seat?  Front or back?

"A.  Front.

"Q.  What happened next Mrs. Vander Wielen after Tommy put your husband in the front seat of the Ford and took him out of the Tempest?

"A.  We went on to that Interstate out from Loxley.  I don't know how far we went down that way.

"Q.  Did you make any stops along that Interstate that you are referring to?

"A.  I stopped and waited for Tommy.

"Q.  Why were you waiting for Tommy?

"A.  He was coming to my car to go back with me.

"Q.  What had he done with your husband and your husband's car?

"A.  I didn't see him when he pushed it off.  I don't know whether it went in the water or over a cliff or an embankment but he told me it went down an embankment.

"Q. Did Tommy get in the car with you after this?

"A. Yes sir.

"Q. Did he drive or did you drive?

"A. He drove.

"Q. Did you head back toward Mobile?

"A. Yes sir. When he turned around.

"Q. After he turned around and headed back toward Mobile did you make any stops?

"A. Yes sir. We stopped at a creek and Tommy hit the dog in the head and killed it. I wasn't right at the water but I know the dog hit the water.

"Q. Did you do anything while you and Tommy were parked at the creek?

"A. I wet a rag and wiped some blood out of the trunk.

"Q. After you cleaned this trunk and Tommy killed the dog at the creek where did the two of you go?

"A. We came on back close to his house and stopped at this filling station where Tommy worked and told the man that he had the measles and wouldn't be able to work.

"Q. Where did you go from the service station where Tommy worked?

"A. To Tommy's house.

"Q. Do you swear that this statement is true and correct to the best of your knowledge?

"A. To the best of my knowledge."

/s/ Louise Vander Wielen."

Appellant further urges that her signed confession was inadmissible under the "fruit of the poisonous tree" doctrine. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Duncan v. State, 278 Ala. 145, 176 So.2d 840. It is insisted the confession was the product of:

(1) The search of appellant's residence;

(2) The unlawful arrest of Tommy Davidson and appellant;

(3) The unlawful search of appellant's automobile in the basement of the court house;

(4) The illegally obtained confession of Tommy Davidson implicating his mother.

We have already said the search of appellant's house did not violate appellant's constitutional rights. We do not consider the arrest and detention unlawful, but even if they were unlawful such fact would not render the confession inadmissible. Bridges v. State, 284 Ala. 412, 225 So.2d 821. No evidence obtained as a result of the search of appellant's automobile was introduced. All the testimony concerning the search was presented outside the presence of the jury. Appellant stated she signed a piece of paper (presumably a waiver) but did not know what she was signing. Prior to signing the confessory statement appellant was told that Tommy Davidson had confessed, and his wife, Laura, urged appellant to tell what happened, saying it would "only be manslaughter."

We cannot say from the record before us that Tommy Davidson's confession was illegally obtained. Mere confrontation with a co-indictee's confession cannot be held to be an unfair tactic or unlawfully coercive. Stevens v. Warden of Maryland Penitentiary, 366 F.2d 565 (4th Cir. 1966); Cox v. United States, 373 F.2d 500 (8th Cir. 1967); People v. Schwartzman, 266 Cal.App.2d 870, 72 Cal.Rptr. 616 (1968); People v. Hunter, 252 Cal.App.2d 472, 60 Cal.Rptr. 563.

There is no testimony that the showing of Tommy Davidson's confession was accompanied by suggestions or requests for a statement by appellant on the part of anyone other than her daughter-in-law, Laura Davidson.

In our view the record sustains the court's action in admitting appellant's confession

Besides, the appellant testified to substantially the same state of facts from the witness stand. Chandler v. State, 283 Ala. 29, 214 So.2d 306.

We have carefully searched the record and find no evidence of a conspiracy on the part of this defendant prior to the killing; no fact or circumstance tending to show that she struck the fatal blow and no affirmative proof that, while present, she did anything to aid or abet in the slaying. The only evidence connecting her·with the crime is that she aided her son in removing the body of deceased. While such evidence was calculated to create a suspicion against her, surmise, conjecture or suspicion is not sufficient to sustain a conviction. Hand v. State, 26 Ala.App. 317, 159 So. 275; Carr v. State, 28 Ala.App. 466, 187 So. 252; Wilks v. State, 21 Ala.App. 180, 106 So. 390.

For the refusal of the general affirmative charge, the judgment is reversed and the cause is remanded.

Reversed and remanded.