263 So.2d 511

**J. J. FRAZIER, alias**

v.

**STATE.**

**3 Div. 75.**

Court of Criminal Appeals of Alabama.

April 4, 1972.

Rehearing Denied May 9, 1972.

Cameron & Cameron, Montgomery, for appellant.

MacDonald Gallion, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

TYSON, Judge.

The indictment charges murder in the first degree. Verdict and judgment of guilty of murder in second degree resulted

in sentence of twenty-five years in the penitentiary.

The evidence is undisputed that the appellant, Willie James Frazier, killed one Ernest Meriweather by shooting him with a .32 caliber pistol. The testimony established that the deceased was employed as a bouncer at the "Tuiauna Club" in the City of Montgomery. His primary duties were to sell tickets at the door and to keep down disturbances.

On July 11, 1969, the night prior to the shooting, the appellant's wife, Bertha Frazier, went to the "Tuiauna Club." Because her purpose was simply to buy and take out food, she was not required to pay the customary cover charge. After purchasing the food she went to the back of the club and began talking with some friends. On two occasions the deceased sent a waiter to ask Mrs. Frazier to purchase a ticket or leave. After the second time, appellant's wife came over to where the deceased was seated and an argument ensued. Joshua Reynolds, the owner of the night club and a witness for the prosecution, testified that he came over and told the deceased, Meriweather, to leave her alone because he did not want any trouble; that appellant's wife remained at the club some thirty or forty minutes before leaving; that he later saw her standing in the door talking to Meriweather who was seated with his head down and not replying.

Appellant's wife testified that on the following night, Saturday, July 12, 1969, she was with some friends in the Highland Cafe; that her husband, appellant, came in the cafe while she was there; that during the course of the conversation she told appellant of the difficulty she had encountered with Meriweather the prior evening; that she and appellant then left the cafe and went to the "Tuiauna Club"; that she stayed outside while appellant went inside the club; that she heard some shots and appellant came running out and told her to go home.

N. D. Davis, an eyewitness to the shooting, testified for the State that he saw deceased with his arms folded telling appellant, "Go ahead on," and that appellant replied, "I ain't going nowhere. We'll settle this now." Then, according to Davis, he heard shots and saw deceased coming toward him saying, "N. D., he hit me. He hit me in the heart."

The appellant testified that at the height of the altercation the deceased reached for a gun and had the gun out before he (appellant) pulled his gun and began shooting.

Detective C. R. Wood of the Montgomery City Police Department investigated the incident. Upon arriving at the club, witness Davis gave him deceased's weapon which was fully loaded. It did not appear to have been fired.

One .32 caliber bullet was removed from the body of the deceased and in the opinion of the State Toxicologist was the cause of death.

The first assignment of error insisted on by the appellant is that the trial court improperly sustained the State's objection to the following question asked of Mr. Willie C. Brown, a witness for the defense:

"MR. CAMERON: Do you know Popcorn Meriweather in Montgomery, Alabama _ _ _ did you know him to be a guntoter?

"MR. LAWSON: Wait a minute! I object.

"THE COURT: Sustained."

The rule regarding the admissibility of such statements is this:

". . . (W)here the evidence tends to show that accused might have acted in self-defense, evidence is admissible to show that deceased was in the habit of carrying firearms or other deadly weapons or that he had the reputation of habitually being armed. It must, of course, be made to appear that such habit

or reputation of deceased was known to the accused, as otherwise it could not have influenced his conduct, and evidence showing such knowledge is admissible." Clinkscale v. State, 37 Ala.App. 593, 73 So.2d 244.

Assuming for our purposes that the appellant was acting in self-defense, it must further appear prior to the introduction of Brown's character evidence that the appellant knew of deceased's reputation for going about armed. Appellant argues that this condition was met when he subsequently testified on cross-examination. From the record:

"Q When you went in there, you knew that Ernest Meriweather had a gun, didn't you?

"A No, I didn't know that. I know he should have one.

. . . . . .

"Q When you walked in there, you didn't know that Popcorn had a pistol?

"A No, I didn't know he had one. I know he should have had one.

"Q And you didn't see it when you walked in there.

"A No, I didn't see it when I walked in."

■ Construed most favorably to the appellant, this testimony cannot be said to be an indication that appellant knew of any reputation of the deceased for going about armed. In any event, the trial court's ruling is not erroneous because it does not appear from the record that *prior* to the introduction of witness Brown's testimony the appellant knew of any such reputation or habit of the deceased. Appellant should have offered evidence prior to that time that he knew of the accused's reputation for being armed. Glover v. State, 200 Ala. 384, 76 So. 300; Gary v. State, 18 Ala. App. 367, 92 So. 533. There being no proper predicate laid for the introduction of Brown's statement, the State's objection to the question was properly sustained.

As witness for the defense, his wife, Bertha Frazier, testified on cross-examination that she did not know a George Hale or "Gray Mare." The State was allowed to prove by John Hale, over the objection of appellant, that Bertha Frazier had on two occasions telephoned John Hale's residence and asked for George Hale. Appellant contends that such testimony is hearsay, therefore inadmissible, and also was impeachment of a material witness on an immaterial matter.

■ A witness may not ordinarily testify to acts or statements made by third parties which occur outside the presence or hearing of the defendant. 29 Am.Jur.2d, Evidence, Section 610. However, for impeachment purposes, a statement may be offered to prove that one made a particular assertion, rather than to prove the truth of the statement, and the evidence is not hearsay. An exception to this well-settled proposition of law is ". . . that if a question is put to the witness which is collateral, or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question, but it is conclusive against him." Ortez v. Jewett Co., 23 Ala. 662; Blakey's Heirs v. Blakey's Ex'x., 33 Ala. 611; Seale v. Chambliss, 35 Ala. 19; Beall v. James Folmar Sons & Co., 122 Ala. 414, 26 So. 1; Carter v. State, 133 Ala. 160, 32 So. 231. The reasons for the rule forbidding the proof of a witness's contradiction upon an immaterial matter have been well stated in Blakey's Heirs v. Blakey's Ex'x., supra.

It is plain enough here that the fact which is sought to be admitted, i. e., whether or not Bertha Frazier had called John Hale's residence and asked for George Hale, such person and such call being in no way materially connected to this case, is without probative value.

■■ The declarations or conduct of a third party, not made or done in the presence of the defendant, are nevertheless admissible into evidence against the defendant if a conspiracy is shown to have existed between defendant and said third party,

and if the declarations were in furtherance of the common purpose of the conspiracy. Thomas v. State, 133 Ala. 139, 32 So. 250; Cox v. State, 240 Ala. 368, 199 So. 806. Even assuming here that there is evidence from which the jury might reasonably infer the existence of a conspiracy, it has not been shown that the telephone calls which appellant's wife allegedly made to George Hale had anything whatsoever to do with the killing of Ernest Meriweather. In fact, it was never proven during the trial when the calls were supposedly made or that such calls were a part of the alleged conspiracy. There is no evidence linking Hale with the appellant. Hale was not shown to have been at the "Tuiauna" Club on either of the evenings in question, nor was he present at the Highland Cafe, or when husband and wife conferred anywhere. Therefore, we conclude that the State was erroneously allowed to impeach the appellant's wife on an immaterial matter.

■ Appellant further insists the trial court erred at the conclusion of its oral charge as follows:

"THE COURT: All right. The law says that written charges in any number can be submitted and my interpretation of the recent Appellate Court ruling of this State and other states and the Federal Court say that trial judges had better give them. So, if a thousand of them are given, I will just have to give a thousand without any discretion whatsoever. So, as I have read them, if they have been confusing, I apologize. Let me further charge you that constituting among other things that constitute murder in the second degree—the killing of one human being by any act greatly dangerous to the lives of others and evidencing a depraved mind regardless of human life although without any preconceived purpose to deprive any particular person of life—

"MR. LAWSON: Satisfied, Your Honor.

"MR. CAMERON: Your Honor, I object to that portion where the Court said that the Court has to give charges. I do object to that part that the Court said.

"THE COURT: Well, I think I said in my opinion. I further charged them that the written charges are to be given the same weight as the oral charge.

"MR. CAMERON: Yes, sir, but I still respectfully except to the Court's remark about having to give them.

"THE COURT: All right. The record will so note. Anything else?

"MR. CAMERON: No, sir."

In Moulton v. State, 199 Ala. 411, 74 So. 454, the Supreme Court found the following statements made by the trial judge prejudicially erroneous:

" 'For the first time in the history of this court since the appointment of an official stenographer so far as I am advised, the judge of the court has been requested to render his charge to the jury in writing. This is a privilege which the law gives, but whether I will be able to make the law in this case more plain to you in a written charge than I could by minutely explaining it to you orally it matters not.' "

In holding these statements by the trial judge improper, the court stated:

" 'Any statement by the court, however unintentional, made in the presence of the jury, calculated to control the jury in its consideration of the weight to be given to testimony, will work a reversal, unless it be clearly shown that such remarks have been explained and excluded from them. It may be thought that the criticism of the court is too restricted and technical; but the principle involved is of such paramount importance it would be dangerous to permit the least infringement of the rule to pass without correction. The separate province of the court and of the jury must be jealously guarded, carefully recognized and preserved.

It is an "anchor sure and steadfast" to protect those on trial for a violation of law, and to restrain the courts from the exercise of undue influence upon the juries, to whom is committed the important and exclusive right of weighing the evidence.'"

In *Moulton,* supra, the court went on to say:

". . . If a judgment of error at this point depended upon a finding that the trial court intended or supposed that this part of its charge would have any effect on the course or result of the trial, there would be no hesitation in our denial of reversible error; but it is matter of common knowledge that jurors are very susceptible to the influence of the presiding judge, watching him with a quick understanding of every indication of opinion, and while we are not to be misled into setting up a too exacting standard for trial judges, we must consider the subject of this exception with a view to its capacity of interpretation as an index of what the judge thought of the accused, his counsel, or his case. Indulgently considered, it seems to have been nothing more than an expression of irritation that the request for a written charge should have been made in the conditions then and there obtaining. But the occasion was charged with grave responsibility; the expression of the judge's opinion was given in formal charge to the jury and had every appearance of great deliberation. It cannot be assumed that the jury gave it no consideration. At best it was erroneous, and it carried a suggestion that should have been carefully avoided. It carried a necessary implication, a forcible suggestion, that the prisoner, or his counsel, was engaged in a useless performance and unnecessarily delaying the rapid progress of the case to a conclusion. It thus reflected unfavorably upon the merit of the defense, though, perhaps, not so directly as to fall within the rule of Griffin v. State, [90 Ala. 596, 8 So. 670], supra. But the defendant had only demanded a law-given right, and it should have been conceded without unfavorable comment. . . ."

The influence of the trial judge, especially when addressing the jury, cannot be overemphasized.

The effect of the trial judge's statements was prejudicial. As noted above, the able trial judge attempted to modify his comments. We conclude that such comments nevertheless constitute reversible error. See Dickey v. State, 21 Ala.App. 644, 111 So. 426.

For the foregoing reasons, the judgment is due to be reversed and the cause is remanded.

Reversed and remanded.

PRICE, P. J., and ALMON and CATES, JJ., concur.