380 So.2d 946 (1979)
William Coy TRAWEEK
v.
STATE.
6 Div. 750.
Court of Criminal Appeals of Alabama.
May 1, 1979.
Rehearing Denied May 22, 1979.
*948 Walter P. Crownover and Jack Lowther, Tuscaloosa, for appellant.
William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State, appellee.
DeCARLO, Judge.
This is an appeal from a conviction by a Tuscaloosa County jury, wherein the appellant was found guilty of first degree murder and sentenced to life imprisonment.
At trial, at the close of the State's case, the appellant made a motion to exclude the State's evidence on the grounds that the State had failed to prove murder in the first degree or "any of the lesser included offenses." This motion was overruled by the trial court.
Subsequent to his conviction, appellant filed a motion for a new trial, which was overruled by the trial court on May 12, 1978, after arguments on the motion had been heard.
The facts in this case are as follows:
On the morning of January 17, 1977, the appellant left Holeman's Grocery Store in Tuscaloosa County, Alabama, "around nine o'clock," with two others, "to ride around and drink some Vodka" belonging to one of the other men, "Ricky" Garner. According to Garner, the men made several stops along the road and returned to the store "about an hour and a half" later. There he and the appellant left the other man and joined another, "Buddy" Smith.
These three men, the appellant, Ricky Garner and Buddy Smith, left in Smith's car "to get some more beer," and continued riding around in the car drinking beer and vodka for another hour and a half. The men then stopped at the appellant's truck, where Smith left, and the appellant and Garner returned to the store in the truck.
From the store the two men "went up to [the deceased] (Smith's) house," where they observed him "out working on his car," and "asked him did he want to ride around and have a few drinks. . . ." According to Garner, Smith responded that he "had to go to work," and after "about six or eight minutes," the appellant and Garner got back in appellant's truck to leave.
Garner testified that, at that point, the appellant "spun some backwards" in his truck, causing "a little" gravel to be thrown by the tires of the truck, as they were leaving. "Pretty soon" the appellant and Garner were overtaken on the road by James Smith, who "pulled in right in front of [appellant's] truck and motioned for [them] to slow down."
Garner stated that the two vehicles then pulled off the road and the men got out. According to Garner, "[t]hey was arguing and James [Smith] was asking him [the appellant] why was he trying to tear his driveway up or something." Garner stated that he saw no weapon in the hand of either man when the argument began but that later he noticed that the appellant "had a knife" and was "holding it keeping James from jumping on him or something."
At one point during the argument, Garner interrupted the men to talk to Smith about an argument he had had with the deceased the previous week and stated that "it was a fine time to settle it. ..." *949 According to Garner, Smith had responded that "he was just drunk. ... and he wanted to make friends. ..." Garner recalled that he thought he then shook hands with James Smith and testified that he had said, "I'm not on either side, I am out of it, I won't take up for either one."
After the above exchange between himself and Smith, Garner stated that he "went back and leaned up against the corner of the [appellant's] truck." At that time, Garner continued, Smith "moved on up toward Coy. ... like he was fixing to jump on him." The appellant then obtained his shotgun from his truck and shot Smith.
The appellant's knife was the only weapon seen by the eyewitness, Ricky Garner, during the argument between appellant and the deceased, until the appellant, according to Garner, "run to his truck and got his gun."
According to Garner's testimony, the appellant "fired three times." He "shot [James Smith] twice real quick," but that there was "time enough for [Garner] to go on the other side of the truck" before the third shot was fired.
Garner stated that, after the third shot, "I went through the woods up to Hall Skelton's and called the ambulance." He testified further, that when he returned, the appellant was still at the scene, and that several people, including the homicide investigators, had arrived. He also stated that neither of the vehicles had been moved from its original position, nor had the body of James Smith been moved, and that "everything was the same as it was."
On cross-examination Garner stated that he "did not remember" how much he had had to drink on the date in question. He agreed that the appellant had told him "[h]e had lost some deer dogs" and that he and Traweek "were going to ride around and kind of look for them. ..." He also stated that the original conversation with James Smith outside his home had been friendly, although Garner had not expected it to be.
Finally, Garner testified that James Smith was "cussing Coy, giving him down the road," and that Smith was "pushing himself" on the appellant. He stated that it "seemed like" the appellant was trying to leave the scene of the argument. However, at one point, Garner also said that "James [the deceased] kept trying to get him [the appellant] to put the knife up."
On re-direct examination, Garner repeated that he had not seen a weapon in the hands of the deceased during the argument. He also stated that the deceased had not followed the appellant back to his truck when Traweek went to the truck to get his shotgun.
The State then presented the testimony of "Buddy" Smith, who stated that he had been drinking with the appellant and Ricky Garner on the day of the shooting and had left the other two men to go home. Smith later encountered the appellant and several other men at the scene of the shooting, where the appellant stated to him, "I killed the S.O.B." Smith indicated that he had not coerced the remark from appellant, nor had he promised appellant any reward before the statement was made.
Smith further testified that he had taken appellant's shotgun from him to "check it," and had noticed that there was no shell in the chamber at the time he took the gun. Smith testified that he then carried the shotgun with him when he went to "a house located across the road" from the scene to call the sheriff's department. Smith returned with the gun and "laid the shotgun by the rear wheel of James Smith's [the deceased's] pickup."
On cross-examination, Smith stated that he had found a pistol "wrapped up in a rag.. . . about the middle of the seat" of the deceased's truck and that he moved the pistol prior to informing the homicide investigators of it, but that he did not "carry it around" with him. Smith also testified that, when he first arrived at the scene, the appellant and several other people were present, and that he "walked up to the body. ... [and] checked it for a pulse," but did not find one.
*950 Included in the State's case was testimony from two State toxicologists, one of whom performed the autopsy on deceased's body, and three of the homicide investigators for Tuscaloosa County who had conducted the investigation of the shooting. These witnesses served to establish that, in the opinion of the toxicologist who performed the autopsy, "death in this case resulted because of damage to the lungs and heart as a result of a gunshot load delivered to the right chest."
The witnesses for the State also established the chain of custody of those State's exhibits introduced into evidence, over defense objections, including photographs of the deceased illustrating the three wounds sustained by him. Also introduced over defense objections were buckshot pellets taken from deceased's wounds, which were largely "consistent with ... number one buckshot," and three spent shotgun shells found in the vicinity of the deceased's body. These shells, in the opinion of the State Toxicologist, had been fired from the Sears twelve-gauge shotgun also found at the scene.
Testimony by the toxicologist, who performed laboratory tests on the evidence gathered at the scene, indicated that, in his opinion, "the muzzle of the shotgun was no closer than eight feet and no further than twelve feet from the [deceased's] shirt at the time of the discharge," and that there was no "presence of ethyl alcohol in the blood specimen" taken from the deceased. However, there was no testimony given by the State as to the measurements between appellant and the deceased at the scene, or anything other than approximate distances given by the eyewitness, Ricky Garner, and a homicide investigator who had "stepped off" the distances between the body and the vehicles.
Finally, testimony by one of the Tuscaloosa County homicide investigators indicated that he had found a "hunting knife," with the blade extended, "on the front seat of the defendant's truck." The officer also stated that he had taken both of the guns into custody at the scene, and that the shotgun was loaded with "three live-shot shells" at the time he found it "lying at the rear of the deceased's truck next to the left rear wheel," and that it was a "twelve-gauge pump shotgun."
Testimony of one of the homicide investigators, who was familiar with firearms, revealed that the shotgun had an odor of gunpowder about it, indicating that it had been fired recently. One officer stated that there was "one spent round" in the deceased's revolver, but no evidence of "any odor or presence of any burned gunpowder," which indicated that, in his opinion, the gun had not been recently fired.
Taken together, the testimony of the two State toxicologists and the three investigators served to establish a chain of custody of the physical evidence introduced by the State sufficient to connect them with the appellant or the scene and to support their admission. Also, due to this testimony, adequate foundations and identifications of those photographs admitted were made prior to their admission into evidence.
The defense presented testimony by Larry and Gary Watson, two men who had arrived at the scene shortly after the shooting. This testimony, for the most part, corroborated the testimony of State's witnesses as to the location of the body, the appellant, the weapons, and the vehicles at the scene. However, both men denied hearing the appellant's statement to "Buddy" Smith as that witness had recalled it and Larry Watson stated that the appellant had said only, "I had to do it." Gary Watson stated that Smith had placed appellant's shotgun "by the body" before taking it with him to call the police.
Terry Holeman testified, for the defense, that he had gone to the scene in response to Larry Watson's statement that "James Smith was laying up there in the highway." Holeman stated that, after arriving, he had "asked [the appellant] what happened" and that Traweek had "said he shot him, that he had to."
Holeman also testified that Buddy Smith had placed the appellant's shotgun "behind James [Smith] in the road" after taking it *951 from appellant and that the appellant had at first told him, "I shot him, but I had to, he had pulled a gun on me."
In response to questioning, Holeman also stated that the appellant had changed his story and said it was a knife rather than a gun that the deceased had "pulled."
Finally, Holeman testified that he had been standing between the appellant and Buddy Smith but had not heard the appellant make any statement to Smith.
The appellant then took the stand in his own behalf. He stated that, on the morning of January 17, 1977, he had been asked by Ricky Garner and Gary Watson "to ride around with him and have a drink of Vodka," and that they were also "going to hunt my deer dogs." Traweek recalled later riding around and drinking with Garner and Buddy Smith but did not recall stopping at James Smith's house or having a conversation with him on that date.
The appellant stated that the first time he saw the deceased on that day was when Smith overtook Garner and himself on the highway and motioned for them to pull over. Traweek reported the argument that he had had with the deceased, but again denied ever being in Smith's driveway that day. Appellant also stated that he had tried to leave and that the deceased had told him, "If you get in your Goddamn truck, I will blow your head off."
During this exchange, Traweek claimed he "saw what I believed was a knife," in the deceased's hand, and that Smith had threatened to kill him. He also stated that he "could" have had a knife but did not remember whether or not he did. Finally, the appellant testified that he believed that Smith was going to kill him, and recalled reaching for his gun but did not remember shooting Smith.
On cross-examination, Traweek identified State's Exhibit No. 33 as his knife, which he admitted having with him on the day he killed Smith. Appellant claimed that Smith had also threatened Garner on that occasion and that Smith had told Garner, "if he didn't get back out of the way, he was going to get the same Goddamn thing I was going to get."
The appellant testified that Smith had "had a pocket knife in his hand," during the argument, but that all he had "seen was the end of it." Traweek stated that he had also seen "the print of a pistol in [the deceased's] pocket, and that, "he told me he had a pistol."
The defense then introduced testimony by five character witnesses to the effect that the general reputation of the deceased in his community for peacefulness and "for carrying a gun" was "bad." One of these witnesses stated that the deceased had "pulled a gun" on him "for no reason." On cross-examination, it was revealed that one of these witnesses had signed the appellant's bond.
The defense then introduced testimony by two witnesses who stated that the general reputation in the community of the appellant "for truth and veracity" was good and that they would believe him under oath. Over defense objections, the State made inquiry of these witnesses regarding the deceased's general reputation in the community, and whether they "had heard in the community [that appellant] had been charged with assault with a weapon," or that he had been arrested previously.
The defense presented testimony by the minister of appellant's church who had known him as a youth and for the past three years, but who stated he had no knowledge of appellant's reputation in the community for truth and veracity.
Finally, two more character witnesses were called by the defense, who also testified that appellant's reputation in his community for truth and veracity was good, but these witnesses were unable to state specific instances or conversations where they had heard such reputation discussed. Over defense objection, the State inquired, on cross-examination, whether the final witness had heard of appellant's prior arrests and his arrest for "highway intoxication."
At one point in the defense case, one of the homicide investigators was recalled and *952 testified that the deceased had had, at the time of his death, "a three-blade pocket knife ... about two and one-half to three inches long," which had been turned over "to the coroner" along with "other personal items" of the deceased which were in his possession at his death. The officer stated that the small knife was found by the employees of the funeral home among the deceased's personal effects. The knife was not introduced into evidence or otherwise referred to at trial.

I
In his brief before this court, appellant asserts that:
"[W]here defendant's requested charge, concerning the jury's right to consider threats of the deceased in justification of the homicide, stated a correct proposition of law, was supported by ample evidence, and was not covered in the court's oral charge, it was the duty of the court to read said charge to the jury and refusal to do so constituted reversible error."
Specifically, appellant complains that it was error by the trial court to refuse defendant's requested charge No. 20, as follows:
"The Court charges the jury that while threats alone will not serve as a justification for homicide, if the Jury believe from the evidence that the deceased, at the time of the homicide was manifesting an intention to carry such threats into execution, by a positive act then done, or, that from the acts of the deceased at the time of the homicide, it would have appeared to a reasonable mind, under the circumstances, that the deceased was attempting to execute the threats against the Defendant, you may then consider the threats made by the deceased in justification of the homicide."
Appellant, in support of this contention, cites primarily Hunter v. State, 295 Ala. 180, 325 So.2d 921, in which he states, "a murder conviction was reversed solely on the failure of the trial court to read the exact charge relied upon by [appellant] in the case at bar." Appellant goes on to cite Pollard v. State, 193 Ala. 32, 69 So. 425, in support of the proposition that:
"Each party has the undoubted right to have the Court charge the jury correctly the law as applied to any theory of the case which the evidence tends to establish. A defendant in a criminal case has been held to have this right, though his evidence alone tends to establish such theory." (citing Munkers v. State, 87 Ala. 94, 6 So. 357.)
We distinguish the present case from those cited above. Here, there is a glaring and important distinction between the facts of the cases relied upon and those which occurred in the present case.
A close reading of the above cited cases reveals that, in each, there was evidence, from a source other than the defendant, that the deceased actually had a weapon (in both cases, a pistol or other firearm), and thus had the present means "to execute the threats against the Defendant," as the requested charge requires.
In each case, it was reasonable for the jury to conclude that the deceased "was manifesting an intention to carry such threats into execution," or "was attempting to execute the threats." Therefore, the charge, or one similar to it, was improperly denied by the court in both of the cases cited. See Hunter v. State, supra.
In addition, the Supreme Court, in its reversal of this court's original opinion in Hunter v. State, supra, refers to this charge as the Karr charge, in reference to its use in Karr v. State, 100 Ala. 4, 14 So. 851. We note that the evidence Karr used to support this instruction to the jury indicates that there was uncontradicted testimony presented at the trial that the deceased was armed with a firearm at the time he was shot and, thus, had, to the mind of a reasonable man, the present means to carry out the threats referred to in the charge. Thus, the charge was also properly given in Karr.
The requested charge, itself, states that it must "have appeared to a reasonable mind, under the circumstances" [Emphasis added] that the deceased was attempting to carry out his threats. We believe that the trial *953 court was correct in determining that, where there was no evidence presented that the deceased might have had a knife, nor any evidence that the deceased was able to carry out his threats, if any were, in fact, made, it would not appear to a reasonable mind, that he was attempting to do so. The trial court thus properly refused the requested charge.
Appellant's argument that, even though his evidence alone tended to establish the theory of self-defense, he was entitled to "have the court charge the jury correctly" concerning that theory is also not supported by the authorities cited.
Appellant's quotation from Pollard, supra, in support of the above contention, omits the citation of authority relied upon by that case for the broad statement that a defendant has a right to a requested charge when he, alone, presents evidence of self-defense. Munkers v. State, 87 Ala. 94, 6 So. 357, which is the case relied upon in Pollard, concerns a charge of seduction, rather than a case of homicide involving a plea of self-defense. Thus, in quoting Munkers, Pollard is making a general statement of the law, rather than one which specifically applies to every incidence of a plea of self-defense in a prosecution for homicide.
Also, in Pollard, supra, the court goes on to say, in the same paragraph quoted by appellant:

"A party has no right, however, to single out his evidence alone, or any other part thereof, as tending to prove the given fact or theory touching which he desires special instructions, as this would tend to have the jury ignore other evidence which might tend to disprove the particular fact or theory to which the requested instruction was directed." [Emphasis added].
Therefore, we hold that, as stated in Pollard, the requested charge is "objectionable as singling out a part of the evidence," and was properly refused by the trial court.

II
Appellant complains that the trial court was in error in overruling his objections to questions asked by the State on cross-examination of character witnesses whose testimony on direct examination was limited to the good character for the specific trait of truth and veracity.
"By presenting evidence of good character [the] accused parts his character in issue and permits the prosecution to introduce evidence in rebuttal ...." 22A C.J.S.
Criminal Law § 676(b).
It is also recognized that good character evidence offered by the accused, prior to an attack on his character by the prosecution, must be limited to his general character for peace and quiet, and he is "not entitled to offer evidence of his general good character or good character for truth and veracity to bolster up his own testimony." Baugh v. State, 218 Ala. 87, 117 So. 426; 22A C.J.S. Criminal Law § 677(5).
In the present case, subsequent to appellant's testimony in his own behalf, the defense attempted to introduce testimony regarding his general reputation in the community for truth and veracity alone.
Also, in our review of the record, we find that the prosecution limited its inquiry, on cross-examination, to that particular trait, until the following exchange occurred:
"Q. You have never done that, you don't know from your own experience or what other people have said to you about if he [the appellant] got in trouble, whether or not he would claim, I just don't remember, rather than testifying truthfully about it?
"A. I have never heard anybody in the community speak nothing against him."
We also note the following responses by appellant's character witnesses on cross-examination, to questions regarding his reputation for truth and veracity:
"A. I have never heard anybody say anything bad about him.
. . . .
"A. Well, I have worked around him, and he worked with my boy three or four years, and I always found him to be a *954 good moral man, and I believe what he said.
"A. Well, I have always heard folds say he is a mighty good neighbor to live in the community, and he would help anybody that he could. I have never heard anybody say anything bad against him.
We hold that the above testimony was sufficient to place appellant's general good character in issue and to bring the inquiry on cross-examination under the rule in Smith v. State, 38 Ala.App. 23, 80 So.2d 302, allowing the prosecution to show evidence of appellant's bad character for peace and quiet prior to the killing. See also Echols v. State, 36 Ala.App. 302, 55 So.2d 522, reversed on other grounds, 256 Ala. 389, 55 So.2d 530; Lynn v. State, 21 Ala.App. 29, 104 So. 870.
In our review of the record, we find that, during the cross-examination of one such defense witness, James Preston Anders, all of the prosecution's questions concerning whether he had heard of certain "unworthy acts" by the appellant were responded to in the negative, which would render any error in allowing the questions harmless. Hamlett v. State, 19 Ala.App. 218, 96 So. 371; Johnson v. State, 260 Ala. 276, 69 So.2d 854.
In view of the above facts, it is our judgment that the trial court was not in error in overruling appellant's objections to the questions propounded, when the defense witnesses had previously testified to appellant's good general character, Smith v. State, supra.

III
The appellant complains that the trial court's refusal to allow him to make inquiry of defense witnesses testifying to the bad general reputation of the deceased, concerning the deceased's reputation for being "overbearing," and for "pulling a gun," constituted reversible error.
It is well settled in Alabama that, after an accused has made an offer of evidence tending to show self-defense, he is entitled to offer proof showing the violent and bloodthirsty nature of the deceased. Aberhart v. State, Ala.Cr.App., 353 So.2d 6; Headley v. State, 51 Ala.App. 148, 283 So.2d 458.
We distinguish Vander Weilan v. State, 47 Ala.App. 108, 251 So.2d 240; Frazier v. State, 48 Ala.App. 210, 263 So.2d 511, and King v. State, Ala.Cr.App., 355 So.2d 1148. These cases stand for the principle that, after proof of self-defense had been offered by the accused, testimony concerning the deceased's bad reputation may involve questions of that witness whether the deceased was a "gun toter," "carried a pistol," or was a "knife toter." These cases are to be distinguished because the question under scrutiny here did not concern whether the appellant was a "gun toter" or "carried a pistol," but whether he had a reputation for "pulling a gun."
In our judgment, the trial judge did not commit error in disallowing the questions concerning the deceased's reputation for "pulling a gun," from a review of the record, it appears that the questions allowed by the court carried substantially the same inference that would be gained by a question concerning deceased's reputation for "pulling" a gun. It would seem reasonable that, if a man were a "gun toter," he would also have the propensity for "pulling" the gun.
Regarding appellant's insistence of error concerning the trial court's refusal to allow the question whether the deceased was "overbearing," we find any error to be without injury. Although the appellant was not allowed to use this phrasing, he received the entire benefit of the question, in that he was allowed to show that the deceased's character was violent, dangerous and turbulent. Whatever advantage this question would have for the defendant was not diminished to such a degree as to be prejudicial by the court's disallowance of the adjective "overbearing."
Based on the foregoing reasons, as well as the extensive charge by the trial court on *955 the elements of self-defense, it is our judgment that any error committed by the trial court in refusing to allow the use of the word "overbearing" was harmless.

IV
Appellant contends that the trial court improperly charged the jury with respect to the burden of proof required in a plea of self-defense. Specifically, appellant stated that the following portions of the court's charge placed an improper burden of proof upon him.
"Now, under certain conditions, gentlemen, and as I say, it is important for you to understand what these conditions are, which the law has laid down, which must be shown by the defendant, unless the evidence for the State proves these things for him, before he, the defendant, can justify or excuse himself on the ground of self defense. ..." [Emphasis as in brief of appellant.]
According to the appellant, "[t]he Court at no other place in its charge clarified or explained the burden in a homicide case as to the defense of self-defense," and refused defendant's written requested charges No. 13, 16, 17, and 30, dealing with this burden.
As authority for this contention, appellant relies upon Vaughn v. State, 293 Ala. 365, 304 So.2d 6, and cases cited therein. Appellant states that, because of the ruling in Vaughn, "[t]he danger sought to be avoided is that of stating the charge in such a manner as to appear to place the burden of proof on the defendant or to create confusion as to where the burden lies."
We do not agree that the portion of the court's oral charge complained of placed the burden of proof on appellant in the manner referred to in Vaughn. First, we would point out that, in Vaughn and each of the cases cited therein, the offending charge referred to "the burden resting on the Defendant... the burden of proof is on the defendant. ..." [Emphasis added.]
Appellant cites Davis v. State, 40 Ala.App. 118, 112 So.2d 353, as indicating that the words "burden of proof" are not required in order to render a charge objectionable. In that case, the Supreme Court was concerned that, although additional instructions to the jury were made by the trial court, after exceptions to the oral charge were taken by the defense, "the court yet left the establishment of self-defense to rest upon a reasonable doubt generated from the evidence brought forth by the defendant." Davis, supra, at 120, 112 So.2d at 354. We do not find this to be true of the court's oral charge in the case at bar.
A reading of the entire oral charge, as it was read to the jury, reveals that twice prior to the portion quoted by appellant, and at least once afterwards, the court charged the jury that the State must meet the burden of proving the defendant guilty beyond a reasonable doubt and to a moral certainty.
The court's oral charge, with respect to the plea of self-defense reads as follows:
"... Now, the defendant comes in here, as I say, presumed to be innocent, and the burden is not cast upon him to prove anything to you, gentlemen. He can just more or less let the State prove it beyond a reasonable doubt and to a moral certainty; but in this case, he claims and alleges that he is not guilty of the offense of murder in any degree, and he says under the pleadings in this case that even if he did in fact kill the deceased, and he does not admit it by this plea, but he says if you should find from the evidence that has come to you in this case that he did in fact bring about the death of the deceased, he nevertheless is not guilty of any degree of murder because under the doctrine of self defense, he was justified in this instance in taking the life of the deceased, and he claims that the evidence shows to you gentlemen that he was in fact not guilty because he had a legal right under the circumstances to defend himself.
"Now, it is necessary, of course, for you gentlemen and it is important for you to understand what we mean when we use the term self defense in law, and as I say, *956 under his plea of not guilty in this case, he, without admitting the facts necessary to be proven by the State to make out a case of criminal homicide under the indictment, he says the facts themselves set up self defense.
"Now under certain conditions, gentlemen, and as I say, it is important for you to understand what these conditions are, which the law has laid down, which must be shown by the defendant, unless the evidence for the State proves these things for him, before he, the defendant, can justify or excuse himself on the ground of self defense, and you must find and it must be shown that first of all there must be present impending peril to his life or great bodily harm, real or so apparent as to create a bona fide belief of an existing necessity to shoot to save himself from death or great bodily harm. That is the first element of the plea of self defense.
"Secondly, that there was no other reasonable mode of escape by retreat or by abandoning the difficulty; that the defendant, another element of the plea of self defense that must be shown is that the defendant was not the aggressor and did not provoke or bring on the difficulty, which he alleges took place between he and the accused. So, he says he didn't bring it on, and he was not the aggressor, and so you have there the three elements, gentlemen, that you must find from the evidence in this case if you find he was justified to do the act he allegedly committed by reason of self defense. As to the danger or apparent danger that I have mentioned in laying down the rule when a defendant may kill his adversary, such danger whether real or apparent, must be present, not prospective, not even in the near future.
"It is important, gentlemen, that you understand the elements of self defense. One, the defendant must be without fault in provoking or bringing on the difficulty. Second, there must have existed at the time, either really or so apparently as to lead a reasonable mind to the belief that it actually existed, a present, imperious, impending necessity to shoot in order to save himself from death or great bodily harm, and third, there must have been no other reasonable mode of escape by retreat, or by avoiding the combat, with safety and without adding peril or endangering his life or suffering great bodily harm at the hands of the deceased, the man he allegedly killed. These elements, these three elements I have mentioned constitute the elements of self defense. You would have to find he was free from fault in bringing on the difficulty. You would have to find that there existed at the time either really or so apparently real as to lead a reasonable mind to the belief that there actually existed a present impending necessity to shoot in order to save himself from death or great bodily harm and there must have been no other reasonable mode of escape."
We do not agree that the emphasized portion of the court's oral charge when read with the remainder of the charge, is actually prejudicial. It was immediately qualified by the statement, "unless the evidence for the State proves these things for him .." which is simply another way of saying that the jury's conclusions about the plea of self-defense must come from the evidence, whether part of the State or of the appellant.
Those charges which have been held to be invalid, as we have said, have stated specifically that the defendant has the burden of proof of the elements of self-defense. See Vaughn v. State, supra, and cases cited therein. Or, as in Davis v. State, supra, they have asked, "do those elements that he had brought in generate in your mind a doubt as to whether the defendant is guilty as charged in the indictment," which implies that the doubt must arise from the defendant's evidence alone.
We believe that the court's statement concerning "these conditions [of self-defense]... which must be shown by the defendant, unless the evidence for the State proves these things for him .." did not place the burden of proof of the elements of self-defense on appellant or *957 "create confusion as to where the burden lies."
We hold that the court's charge complained of, suggested only that appellant must offer some evidence tending to generate a reasonable doubt of his guilt, if this was not at first accomplished by the State's case, if, indeed, it suggests anything. We do not find the charge to be in conflict with the authorities discussed above, and we do not find that the court erred in refusing appellant's four written requested charges.
Each of the written charges requested by appellant at trial, while perhaps making a correct statement of the law, dealt with the required elements of the plea of self-defense and the requirement of reasonable doubt of guilt in order to acquit. As we have stated, the trial court, in its oral charge, adequately defined for the jury the term reasonable doubt and the elements of self-defense. The charges requested were, therefore, redundant and, thus, were properly refused by the court.
We have reviewed the entire record and find no error prejudicial to the appellant. Therefore it is our opinion that the judgment of conviction should be affirmed.
AFFIRMED.
HARRIS, P. J., and TYSON, J., concur.
BOOKOUT and BOWEN, JJ., dissent.
BOWEN, Judge, with whom BOOKOUT, J., joins, dissenting.
I must respectfully dissent from Part I of the majority's opinion.
This Court recently set forth the controlling principles of law governing the refusal of the trial judge to give a written requested charge.
"In determining whether a requested charge should be given, the question is not whether the court believes the evidence supporting the charge, `but simply whether such evidence was presented.' Hunter v. State, 295 Ala. 180, 325 So.2d 921 (1976).
"The trial judge may have had reason to disbelieve the appellant's version of the facts, however, he did not have legal cause to withhold that version of the facts from the jury's consideration.
"In Burns v. State, 229 Ala. 68, 155 So. 561 (1934), our Supreme Court held in part as follows:
`Our decisions are to the effect that every prisoner at the bar is entitled to have charges given, which without being misleading, correctly stated the law of his case, and are supported by any evidence, however weak, insufficient, or doubtful in credibility. Gibson v. State, 89 Ala. 121, 8 So. 98, 18 Am.St. Rep. 96. And in Morris v. State (Ala. Sup.), 39 So. 608, 611, it is said: `It matters not how slight the tendency of evidence may be towards establishing any material fact involved, the court cannot exclude it from the jury. Its weight is for their determination....' (Emphasis supplied.)
"Likewise, in Chavers v. State, Ala., 361 So.2d 1106 (1978), the Alabama Supreme Court stated:
`... (O)ur decisions are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility....' Curtis Sanders Giles v. State, 366 So.2d 351 (Ala.Cr.App. 1978)."
See also Miller v. State, 40 Ala.App. 533, 119 So.2d 197, cert. denied, 270 Ala. 739, 119 So.2d 201 (1960); Bradberry v. State, 37 Ala.App. 327, 67 So.2d 561 (1960); Degro v. State, 34 Ala.App. 232, 38 So.2d 354 (1949); Duncan v. State, 30 Ala.App. 356, 6 So.2d 450, cert. denied, 242 Ala. 329, 6 So.2d 454 (1942).
The requested charge should have been given regardless of which side presented the evidence to support the charge.